**WEBSTER v. BOWLES et al.**

No. 4807.

United States Court of Appeals
First Circuit.

June 7, 1954.

---

Laszlo Kormendi, New York City (Bartholomew A. Brickley, Howard W. Cole, Brickley, Sears & Cole, Boston, Mass., and Graustein & Kormendi, New York City, on brief), for appellant.

Robert W. Meserve, Boston, Mass. (Arthur T. Garvey, Springfield, Mass., and Nutter, McClennen & Fish, Boston, Mass., on brief), for appellees.

Before MAGRUDER, Chief Judge, and WOODBURY and HARTIGAN, Circuit Judges.

MAGRUDER, Chief Judge.

The complaint in this case sought specific performance of an alleged contract to sell to plaintiff 70,000 shares of stock in Alliance Manufacturing Company, an Ohio corporation. Federal jurisdiction was based upon diversity of citizenship. At the outset, the district court made an order severing issues for trial, directing that the issues whether there was a contract, and, if so, whether it complied with the Statute of Frauds, be tried together as separate issues in advance of the trial of other issues in the case. Plaintiff testified at length regarding his negotiations with defendant Sherman H. Bowles, since deceased, and much documentary evidence was received on the segregated issues. At the conclusion of the plaintiff's case, the district court indicated that it was prepared to make its ruling, so evidence was not put in on behalf of the defendants. The court found as facts that no firm offer to sell was made by Bowles, and that if there was such an offer, it had lapsed by failure of plaintiff to accept it within a reasonable time; and it ruled as a matter of law that on the plaintiff's own showing there was no evidence to warrant recovery. Accordingly, the court entered judgment dismissing the complaint, from which judgment the plaintiff has taken this appeal.

It seems that the plaintiff owned or controlled 33,000 shares of stock in Alliance Mfg. Co., and that Bowles owned or controlled 70,000 shares in the same company. Of the two, Bowles had been the more active in supervising the operations of the company. Beyond any doubt, the early negotiations between the plaintiff and Bowles were looking to a purchase by Bowles of plaintiff's interest in Alliance Mfg. Co., rather than the other way around.

Plaintiff had a conference with Bowles in New York on February 4, 1950, and again in Boston on February 14, 1950. At these conferences Bowles elaborated upon a plan of his for a merger of Alliance Mfg. Co. with Atlas Tack Corporation (of which Bowles was president) on the basis of 5 shares of Atlas for 9 shares of Alliance. According to the plaintiff's testimony, he told Bowles that he wasn't interested at all in the merger proposal, "but I told him if he wanted to pay cash to all the shareholders of Alliance and we agreed on a certain price, that I would go along or use my best efforts to go along in the deal." At the Boston conference on February 14, 1950, some kind of tentative agreement was reached between Bowles and the plaintiff for the purchase of the 33,000 shares of stock in Alliance Mfg. Co. owned or controlled by the plaintiff.

Thereafter, the plaintiff went to New York, thence to Chicago and Cleveland, and finally returned to his office in Montreal on February 22, 1950. While in Chicago plaintiff had seen Mr. Doyle, the president of Alliance Mfg. Co., and told him that he thought he had disposed of his 33,000 shares in the company. Mr. Doyle tried to tell plaintiff that he was foolish to sell out, but plaintiff testified that he had made up his mind "if Mr. Bowles went through with his understanding that I would have to go along". But evidently plaintiff arrived back in Montreal on February 22, 1950, with the feeling that he had made a mistake in entering into arrangements with Mr. Bowles for the sale of plaintiff's stock.

When plaintiff arrived at his office in Montreal on February 22, he found awaiting him two communications from Bowles relating to Alliance Mfg. Co. The first was a letter from Bowles to

the plaintiff, dated February 15, 1950, in the following terms:

"Confirming conversation held yesterday afternoon at the Statler, enclosed is a certified copy of the vote of the Board of Directors of Atlas Tack Corporation, held this afternoon, showing authorization of purchase of your 33,000 shares of stock of the Alliance Manufacturing Company.

"Enclosed is check for agreed upon down payment of $129,000, and three notes covering the balance of the payment.

"If your stock is in New York with Albert Wonham, would you please instruct them to deliver the stock to our Miss Adele Sarbach, Room 1710, 31 Nassau Street, New York City. They need just to notify her, and she will pick it up at their office.

"Would you please also instruct them to deliver a proxy for the annual meeting of Alliance Manufacturing Company to be held March 9, 1950, in case there is any delay in the transferring of the stock.

"Do you think of anything else that either of us should do in the mechanics of this transaction? I am sure everything will work out all right.

"We are sending you copy of the rest of the Atlas vote in relation to the offer made to the other stockholders, for your records. Mr. Hott, Hansen and Doyle, with whom I happened to talk all seem to think well of your suggestion to have the offer made by Atlas to all of the Alliance stockholders."

Enclosed with this letter, in addition to the copies of the Atlas votes referred to, was a check of Atlas Tack Corp. in the sum of $129,000 payable to the plaintiff and three promissory notes made by Atlas Tack Corp. in the sum of $100,000 each covering the balance of the purchase price, which thus figured out at $13 per share. At the trial, plaintiff claimed that the terms of this letter of February 15 were not in accordance with the understanding arrived at between plaintiff and Bowles at their Boston conference on February 14. Whether this was so or not has become immaterial for purposes of this case.

The second communication from Bowles which plaintiff found upon his return to Montreal on February 22 was a telegram from Bowles dated February 20, 1950, as follows:

"If for any reason you do not wish to carry out agreement for purchase of your Alliance stock by Atlas will be glad to sell you our stock including small stockholders total 70,000 shares at price of 13—"

It is the theory of plaintiff's case that this telegram of February 20, notwithstanding its brevity and lack of detail, had been understood by the plaintiff, and reasonably so under the circumstances, as constituting a firm offer by Bowles to sell his 70,000 shares to the plaintiff at $13 a share, and that plaintiff had made a timely acceptance of this offer while it was still outstanding. On the other hand, appellees maintain that the wording of the telegram, in the background of the prior negotiations between the parties, could fairly be construed as being no more than a suggestion on Bowles's part of a willingness, in the event that the arrangement for the purchase of plaintiff's shares fell through, to negotiate with the plaintiff the details of a reverse transaction involving a purchase by the plaintiff of the shares owned or controlled by Bowles.

After receipt of the telegram of February 20, plaintiff had no communication with Bowles until February 24, when he sent to Bowles the following telegram:

"Would like to discuss Alliance at your earliest convenience. Available New York late Monday, but suggest breakfast at Canadian Club eight thirty Tuesday morning."

This telegram of course was not an acceptance of the alleged offer by Bowles to sell, nor did it indicate that plaintiff interpreted the telegram of February 20 as constituting a firm offer to sell. Upon the contrary, the expressed desire

"to discuss Alliance" would seem to imply that plaintiff regarded everything as being in suspense, and that plaintiff wanted further talks with Bowles looking toward a deal either way with reference to the Alliance stock. Plaintiff's explanation is that, though he had every desire to accept Bowles's alleged offer as promptly as possible, he did not wish to do so until he could assure himself that he would be able to raise the cash sum of $910,000 needed to purchase the 70,000 shares owned or controlled by Bowles. Having made the necessary arrangements with his bankers, plaintiff testified, he went to New York intent upon accepting Bowles's alleged offer. Admittedly, however, he did not bring with him, for return to Bowles, the check for $129,000 and the notes for $300,000 which Bowles had sent to him in the aforesaid letter of February 15.

In New York, the plaintiff had three conferences with Bowles, the first on the morning of February 28, 1950, the second on the afternoon of the same day, and the third a brief one on the following day.

At the first of these conferences, according to plaintiff's testimony, Bowles came in and started to criticize the management of Alliance Mfg. Co. "I told him I was there for one purpose and that was to accept his offer to take up his shares and I thought his criticism of the management was quite irrelevant." If this purported acceptance did not conclude a contract between the parties, there never was any contract; for the subsequent words and conduct of Bowles, as testified to by the plaintiff himself, made it perfectly clear that Bowles did not regard himself as having made a firm offer to sell, and the plaintiff must have understood thereafter that Bowles was not even willing to discuss selling his interest in the company. When plaintiff made his little speech purporting to accept the offer to sell, Bowles "just started talking about the poor management of the Alliance Company." During the conference on the morning of February 28, which lasted the better part of two hours, plaintiff "tried three times to get him to accept and he changed the subject and he suggested we draw someone else into the picture." When it was apparent that they "weren't getting anywhere", it was agreed, before the meeting broke up, that they would draw two other men into the discussion. At the afternoon conference on February 28, attended by plaintiff, Bowles, and the two other men, plaintiff again expressed his desire to purchase Bowles's shares, but there "was no answer at all." At the third conference on March 1, as soon as plaintiff tried to bring up the subject, Bowles "up and left", saying he had an urgent appointment. Whereupon plaintiff called his Montreal office and arranged to have the following telegram sent to Bowles under date of March 1:

"Confirming conversation yesterday you offer to sell 70,000 shares Alliance at 13 accepted delivery against payment can be arranged with George Textor Vice President Marine Midland Trust Company 120 Broadway New York—"

This was followed up by a confirmatory letter from the plaintiff to Bowles dated March 8.

Upon the whole record, we are satisfied that the district court was warranted in finding that the telegram by Bowles of February 20, 1950, on its face and in its context was plainly not a firm offer. See 1 Williston on Contracts (Rev. ed.) § 27; Am.L.Inst., Rest. of Contracts, § 25. Accordingly the purported oral acceptance by the plaintiff at his conference with Bowles on the morning of February 28, 1950, did not result in a binding contract. This being so, it becomes unnecessary for us to review the correctness of the other finding by the district court to the effect that, if the telegram of February 20 had constituted a firm offer, such offer had lapsed by failure to accept it within a reasonable time. Other alleged errors have been considered and found to be without merit.

The judgment of the District Court is affirmed.